**FILED**
**CLERK**

7/30/2015 11:39 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
MARLAYNA TILLMAN,

                            Plaintiff,

        -against-

VERIZON NEW YORK, INC. and JOHN
DINKINS and RUDDY REYES, *individually
and as aider and abettors*,

                            Defendants.
----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-4386(ADS)(ARL)

## APPEARANCES

**LAW OFFICE OF MATTHEW S. PORGES, ESQ.**
*Attorneys for the Plaintiff*
641 President Street, Suite 205
Brooklyn, NY 11215
        By:    Matthew Scott Porges, Esq., Of Counsel

**WHITE AND WILLIAMS LLP**
*Attorneys for the Defendants*
427 Bedford Road, Suite 250
Pleasantville, NY 10570
        By:    Scott H. Casher, Esq.
               George C. Morrison, Esq., Of Counsel

**SPATT, District Judge:**

        The Plaintiff Marlayna Tillman ("Tillman" or the "Plaintiff") commenced this

action against her former employer, Defendant Verizon New York, Inc. ("Verizon"),

and two of her former supervisors, Defendants John Dinkins ("Dinkins") and Ruddy

Reyes ("Reyes"), together with Verizon and Dinkins, the "Defendants"), alleging

1

disability discrimination in violation of the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law.

Presently before the Court is a motion by the Defendants for summary judgment seeking to dismiss the Plaintiff's Complaint in its entirety.

For the reasons set forth in this opinion, the Court grants summary judgment dismissing the Plaintiff's federal claims and declines to exercise supplemental jurisdiction over her state and city law claims.

## I.     Background

Unless otherwise noted, the following facts are not in dispute and are construed in favor of the Plaintiff.

### A.     The Parties

Tillman is an individual residing in Kings County, New York.

Verizon is a domestic corporation, which maintains a place of business at 140 Wall Street in New York City.   At all relevant times, Defendant Dinkins was employed by Verizon in the position of Supervisor Logistic Services.   Defendant Reyes was employed by Verizon as Manager Northeast Logistics.

At all the relevant times, Dinkins and Reyes were the Plaintiff's supervisors. Reyes was also Dinkins's supervisor.

### B.     The Plaintiff's Employment by Verizon

On October 27, 2008, the Plaintiff was hired by Verizon as a temporary employee.   Her job title was "Driver B."   Her direct supervisors were Defendant Dinkins and non-party Tereska Flood.

For the first two months of Tillman's employment she worked in Verizon's Springfield Gardens facility in Queens, New York. However, after the first two months, the Plaintiff worked exclusively from the company's Plainview location in Nassau County.

With respect to the length of Tillman's term as a temporary employee, Verizon provided the Plaintiff with a written job offer, advising her as follows:

> Your employment with Verizon may be covered under the terms of a collective bargaining agreement, and, if so, the terms of that agreement govern the conditions under which [Verizon] may terminate your employment. Otherwise, please note employment with Verizon is employment-at-will and this letter does not represent an employment contract, which means either you or Verizon can terminate your employment at any time, for any reason or no reason, and with or without notice.

See Exhibit "F" to the Feb. 13, 2015 Declaration of Scott Casher ("Casher Decl.").

It is undisputed that when Tillman was hired by Verizon, she became a member of a union and was covered by the "Agreement Between Verizon Services Corp. and Communications Workers of America, AFL-CIO, District One, effective August 3, 2008" (the "CBA"). The CBA defines a "temporary employee," in relevant part, as follows:

> [O]ne who is engaged for a specific project or a limited period, with the definite understanding that his employment is to terminate upon completion of the project or at the end of the period, and whose employment is expected to continue for more than three (3) weeks but not more than three (3) years. . . .

See Ex. "E" to the Casher Decl.

The Plaintiff does not materially dispute the applicability of this provision, or that her temporary term of employment was not to last more than three years.

Rather, Tillman believed that she would be given the opportunity to be made a permanent employee when her initial term expired. In this regard, the Plaintiff testified that she did not know whether she would be expected to apply for full-time employment at the expiration of her temporary term, but she understood that occasionally Verizon decided to hire temporary employees on a full-time basis. According to Tillman, these decisions were merit-based.

However, Tillman also testified that she does not recall ever being told that temporary employees were automatically hired on a full-time basis, and did not know whether such decisions were based on Verizon's hiring needs at the time. Reyes testified that such decisions *do* depend on the company's hiring needs, and that Verizon hires temporary employees as a deliberate way of adding labor to address specific temporary needs.

The Plaintiff testified that, at the time of her hire, she was one of nine or ten other individuals hired as temporary employees by Verizon. Reyes testified similarly.

Dinkins testified that Tillman was hired as part of a temporary team specifically assembled to work in the centralized pre-staging environment.

In this regard, the Plaintiff testified that her job consisted of occasional driving, but was mostly a "warehouse position" involving work on a loading dock, breaking down equipment, and building pallets for technicians in the field. Dinkins similarly testified that driving was not the Plaintiff's primary function. Tillman testified that this work required her to lift objects weighing more than five pounds

on a regular basis. On occasion, the Plaintiff would be assigned a task that did not involve lifting, such as removing batteries from Verizon remote controls. However, Tillman testified that lifting objects weighing more than five pounds was a primary responsibility of her employment.

The Plaintiff testified that she was surprised to learn that the "Driver B" position was a warehouse job that involved infrequent driving. However, Reyes testified that "Driver B" is a "universal title" that encompasses many other job activities other than driving.

When a temporary Verizon employee reaches the end of his or her term, Verizon may terminate the employee. This process is referred to by the parties as being "job completed." As described by Reyes, Verizon has discretion at the end of a temporary employee's three-year term to determine that the employee's services are no longer needed or to offer him or her a full-time position. Again, the undisputed evidence demonstrates that the decision to offer a temporary employee full-time employment is discretionary and dependent upon Verizon's hiring needs.

The Plaintiff testified that the other temporary employees with whom she worked were all "job completed" at the expiration of their three-year terms. She understood that her co-workers were terminated because Verizon did not have enough work for them at that time.

Dinkins testified that, generally, Tillman was a capable employee. He testified that she was efficient, knowledgeable, able to take direction, generally punctual, and got along well with others. However, he recalled two instances in

which he was required to discipline her.  First, Dinkins had a discussion with the Plaintiff concerning the manner in which she lifted a box.  According to Dinkins, she lifted the box in an unsafe manner.  However, Dinkins spoke with Tillman about this incident and did not create a written record.  Second, Dinkins testified that he had a discussion with the Plaintiff and her union about the manner in which she performed one of her job duties, namely, replenishing set top boxes for technicians in the field.  Dinkins testified that the Plaintiff performed this function incorrectly, which breached the established protocol for such work.  Dinkins also testified that he occasionally spoke with Tillman about lateness, but never wrote her up for being late.

Reyes testified that he did not recall there being any negative issues with the Plaintiff's work performance.

## C.    The Plaintiff's Injury

Approximately three or four months into her employment with Verizon, Tillman began to experience pain and discomfort in her arms.  She had not experienced similar pain or discomfort prior to working at Verizon.

On January 22, 2009, Tillman visited Dr. Arnold M. Illman of Nassau-Suffolk Orthopedic Associates, P.C. in connection with her arm pain.  In a report created after the visit, Dr. Illman noted that the Plaintiff had developed pain on the "lateral aspect of both elbows."  Dr. Illman further noted that Tillman "continues to do the same type of work despite pain."  The doctor diagnosed the Plaintiff with "[b]ilateral tennis elbow" and prescribed a medication for her called Naprosyn.

Tillman continued performing her job duties throughout the remainder of 2009, despite her injuries.

On or about December 17, 2009, the Plaintiff allegedly reported her injury to Defendant Dinkins. Dinkins disputes this. He testified that he only learned of Tillman's injury from a Verizon employee named Lynette Anthony, who conducted an investigation into Tillman's injury and created an accident report to document it. The report concluded that Tillman suffered bilateral ulnar nerve injury from making repetitive lifting motions. Defendant Reyes is listed as an "investigation contact" on the report.

The Plaintiff testified that, at the time she reported her injury in December 2009, she knew that she was eventually going to be "job completed" and that her temporary employment with Verizon would be terminated.

## D. Allegations of Discriminatory Conduct by Dinkins and Reyes

Tillman testified that Defendant Dinkins treated her differently than other similarly-situated employees because he occasionally assigned a heavier workload to her than her coworkers. For instance, the Plaintiff explained that she, more than her coworkers, was required to perform the task of scanning converter boxes, which required lifting the boxes. In this regard, Tillman testified that her coworkers also did this job, but not to the same extent that she did. She testified that she does not know what motivated Dinkins to assign a disparate workload to her.

However, other than assigning her an allegedly disparate workload, Tillman does not identify any other difference in the way Dinkins treated her compared to similarly situated coworkers.

Tillman also stated that, at times, she and Dinkins did not "see eye to eye on a lot of things" but she did not elaborate on that point.

With respect to Reyes, the Plaintiff testified that he "indirectly" discriminated against her by overseeing and approving everything that took place in the warehouse where Tillman worked.

Tillman testified that, during the period of time she was employed by Verizon, she was unaware that Verizon had anti-discrimination policies. According to Reyes, Verizon's Code of Conduct contains such policies. Tillman testified that, despite receiving Verizon's Code of Conduct, she did not read it. She further testified that, during the relevant time period, she did not contact Verizon's human resources department or equal employment office for any reason.

## E.  The Plaintiff's Medical Leave

In mid-December 2009, the Plaintiff took several actions related to her injuries, namely, she applied for workers' compensation benefits; she applied for short-term disability benefits through MetLife insurance company; and she took workers' compensation disability leave from her employment with Verizon.

The Plaintiff testified that she received benefits for approximately one year after she stopped working at Verizon.

The undisputed evidence establishes that MetLife coordinated disability benefits on behalf of Verizon. In a letter regarding Tillman's receipt of short-term disability benefits, a MetLife representative named Sean Peltier wrote that Tillman had been approved for benefits through December 12, 2010, and that she would be responsible for communicating with MetLife and Verizon during her absence. The letter stated that if Tillman's disability continued past December 12, 2010, she would be required to contact MetLife and so advise them. In order to continue her benefits past that date, the Plaintiff was instructed to arrange for her physician to fax specific medical information to MetLife for its consideration. In addition, the letter stated that, in the event Tillman's doctor cleared her for work, with or without restrictions, prior to December 12, 2010, she "must contact MetLife and [her] Supervisor/Absence Administrator immediately."

A claim activity log maintained by MetLife during the Plaintiff's medical leave reveals close monitoring by MetLife of Tillman's medical condition in late-2009 and throughout 2010. See Ex. "I" to Casher Decl. Near-daily entries in this log note communication between Tillman and MetLife case workers; updates from Tillman's doctor visits; and other pertinent information regarding her injuries.

In a note dated December 1, 2010, Tillman's independent treating physician, Dr. Robert Hecht of Island Musculoskeletal Care M.D., P.C., cleared her to return to work on light duty, with a restriction on lifting objects weighing more than five pounds.

Tillman testified that, upon receiving this note, she did not provide it to anybody at Verizon.  Rather, she stated that she believed the doctor's office had provided it to Verizon.  Also, there is no evidence that Tillman provided the note to MetLife at this time.

On December 10, 2010, a representative of MetLife made an entry on Tillman's claim activity log that stated, in pertinent part: "Marlayna Tillman . . . had an IME [independent medical examination] appointment yesterday [December 9, 2010] at 10:30 A.M.  She arrived at 9:30 A.M. and said that she could not stay for her 10:30 A.M. appointment."

## F.    The Plaintiff's Return to Work

On Friday, December 17, 2010, at 5:12 P.M., Tillman wrote the following e-mail to Dinkins:

> J.D. –
>
> My treating physician has cleared me to return to light duty work at Verizon, with restrictions.  I spoke with Local 1104 reps and was advised that Verizon may not offer light duty work, however, there are current negotiations to re-hire the temporary Driver-B employees that were laid-off [*sic*] in 2009.
>
> Please clarify if you would, the availability of light-duty assignments as of this date, and advise on the status of rehiring temporary workers that were laid-off [*sic*] in my classification.
>
> Any information would be greatly appreciated.
>
> Regards,
> 'Jet'
> Marlayna Tillman

See Ex. "M" to the Casher Decl.

Before receiving a response to this e-mail, sometime between 6:00 and 7:00 P.M. on December 17, 2010, the Plaintiff arrived at Verizon intending to work on the night shift.

She testified that, prior to returning, she did not speak with anybody at MetLife. Instead, after receiving clearance from her doctor on December 1st, she unilaterally decided to come to work on December 17th.

The Plaintiff testified that she "pretty much concluded that [her doctor's note] had already been sent out to [Verizon], so they should have known that [she] was coming back on the 17th." However, this is inconsistent with her e-mail to Dinkins on December 17th, which appears to advise him, for the first time, of her clearance to return on light duty. This is also inconsistent with Dinkins's testimony that he never received notification from MetLife that the Plaintiff had been approved to return to work. As discussed below, the evidence establishes that MetLife is the only entity with authority to approve injured employees returning to work, with or without restrictions.

Reyes also testified that he was not informed of the Plaintiff's intentions to return to work in December 2010. According to Dinkins, as far as Verizon was concerned, Tillman was still out on disability as of December 17, 2010.

Tillman testified that she did not know that certain procedures needed to be followed before she returned to work. She testified that she believed she could simply come back when she was ready, so long as she complied with the physical restrictions recommended by her independent treating physician. This is

inconsistent with the letter from MetLife approving her short-term disability benefits. As noted above, in that letter, MetLife explicitly directed Tillman to keep MetLife apprised of such matters. This is also inconsistent with her e-mail to Dinkins, which specifically requests information regarding the availability of light duty assignments.

Reyes testified that there is "a whole process" that Verizon is required to follow before injured employees may return to work. As he described, MetLife "accept[s] all the medical information, because we [Verizon] don't deal with medical notes [or] doctors." According to Reyes, all the medical information is marshaled by the MetLife case worker assigned to the employee's disability claim, who evaluates it and then negotiates with Verizon on the employee's behalf regarding a return to work, with or without restrictions. Reyes testified that, before returning to work, Tillman "needs to follow that procedure."

Reyes also stated that Verizon simply does not evaluate restrictions based on an independent doctor's note; employees seeking to return to work must follow the procedure outlined above. This is consistent with Dinkins's testimony, described more fully below, that the decision as to whether an employee can return to work and potentially be accommodated is ultimately made by MetLife. Reyes stated that "it is not [Verizon's] responsibility to go out and proactively get people back to work."

Nevertheless, the Plaintiff testified that she arrived on December 17th for the night shift. She fails to explain why she assumed that she was supposed to work the night shift, saying only that she "concluded" as much.

When she arrived, she handed a copy of her doctor's note to a Verizon supervisor named Eleanor Moffatt-Pender, who Tillman then allegedly observed placing a call to Defendant Dinkins. Tillman testified that Moffatt-Pender advised Dinkins that she had reported to work, and that Dinkins approved of her being assigned the task of delivering Verizon's intramural mail. Dinkins disputes this. He testified that when Moffatt-Pender called him, he advised her that Tillman must return to full duty or she cannot return at all.

Nevertheless, Moffatt-Pender assigned Tillman the task of delivering the intramural mail on the night of December 17th, something she had never done before during her employment. This task allegedly did not require Tillman to lift anything over five pounds. Dinkins testified that this job typically belongs to a full-time employee and did not come within the parameters of the special project for which Tillman was temporarily hired. He emphasized the difference between full-time employees and temporary employees, namely, temporary employees are hired to exclusively perform work on a particular project; they may not be given work that otherwise belongs to a full-time employee. In fact, Moffatt-Pender is the supervisor of a department completely separate from that in which Tillman was hired to do temporary work. According to Dinkins, she is essentially his counterpart in a different department.

The interaction between Moffatt-Pender and Dinkins was memorialized by Moffatt-Pender shortly after midnight in an e-mail to Dinkins and Reyes. She wrote, in relevant part:

> Per our conversation tonight. Jet [Tillman] came in at 6pm looking for you. Jet stated that she emailed you today informing you that she was coming in today. I emailed and called you. When we spoke I told you that she was here looking for you. I put a copy of her letter [*i.e.*, the doctor's note] under your door. The letter states light duty. Jet stated Metlife spoke to someone . . . about her coming back on light duty. Per our conversation I had her do pics until you tell me further. . . .

See Ex. "N" to the Casher Decl.

On Saturday, December 18, 2010, at 8:59 A.M., Dinkins forwarded Tillman's e-mail to Reyes.

At 3:55 P.M. that same day, Reyes responded as follows: "OK. If she comes in on Monday we send her home unless she is at full duty with a note stating that."

Tillman testified that, at some point over the weekend between Friday, December 17th, and Monday, December 20th, Dinkins left her a telephone message. According to Tillman, he notified her that she could not return to work until she had been cleared for full duty. He further advised her that if she attempted to come back to work before receiving such clearance, she would be sent home.

In response to this message, Tillman did not call Dinkins back and did not contact MetLife. In fact, the Plaintiff testified that she did not speak with anyone else about returning to work.

Dinkins's recollection is different. He testified that he had a conversation with Tillman, although he could not recall whether it was in-person or over the

telephone.  Dinkins testified that, prior to speaking with Tillman, he contacted a representative of Verizon's human resources department for guidance on how to address Tillman's situation.  His inquiry was forwarded to MetLife, who indicated that it had not approved the Plaintiff to return to work.  Consequently, Dinkins advised Tillman that she could not be on Verizon's property until she provided the required documentation clearing her to return to work.

On December 20, 2010, an entry was made on Tillman's MetLife claim activity log.  The entry stated, in pertinent part, that Tillman had been advised by MetLife that her disability benefits claim was denied due to her failure to stay for the scheduled IME on December 9, 2010.  In addition, the entry states that Tillman tried to take the position that the IME had actually been scheduled for 9:30 A.M.; that she was, therefore, on time; and that the physician was late.  However, this contradicts Tillman's position, reflected in the December 10th entry, that she had arrived early for the IME and stated that she could not stay for the 10:30 A.M. appointment.

Another entry on December 21, 2010 appears to reflect that MetLife advised Tillman that it had not contacted Verizon on her behalf regarding a return to work with restrictions, or a possible accommodation.  Also, the entry indicates that MetLife did not intend to do so unless and until Tillman's IME was completed.

On December 27, 2010, an additional entry was made in Tillman's activity log, which provides, in pertinent part, as follows:

. . . There is no clinical update provided by HCP ["health care professional"] to support [Tillman]'s inability to perform her usual job duties. [Employ]ee did not attend her IME appointment which would likely have provided an accurate description of her functional status. Therefore, there is no clinical evidence that [Tillman] is unable to perform her usual job duties beyond 12/12/10.

## G. The Allegedly False Denial of Light Duty Assignments

Tillman's principal contention in this case is that the Defendants discriminated against her on the basis of a disability by falsely representing that light duty assignments were unavailable.

In this regard, Tillman testified that she believed such assignments *were* available because: (1) on the night of December 17, 2010, Moffatt-Pender assigned her to light duty work; and (2) she recalled other workers returning from medical leave and receiving light duty work.

In particular, as one such example, the Plaintiff identified a coworker named Ansell Thompson, who was a full-time employee. However, Tillman testified that she did not know the nature of his disability or the physical restrictions placed upon him when he returned to work. Rather, she recalled only that he had been out of work for a time due to an injury and, upon returning, performed work different than the work he typically performed.

Another example provided by the Plaintiff was one Ed Egen. The Plaintiff claims that he went on medical leave due to an on-the-job injury to his hand. However, again, Tillman did not know any specific facts about the injury, how long he was out of work, or whether his return to work was conditioned on any physical restrictions.

A third example given was a man the Plaintiff could only identify as Bruce. As to him, the Plaintiff did not know whether he worked in her department, what the nature and extent of his injury were, or whether he had any physical restrictions when he returned to work. The Plaintiff allegedly learned of Bruce's situation from a union representative and her former supervisor, Tereska Flood.

Regarding what she perceived as the Defendants' discriminatory denial of light duty assignments, Tillman testified as follows:

> [T]o me it just appeared as though, again, with my relationship with John Dinkins, it appeared to me that he didn't want me to be able to return, and there were certain things that should have been discussed that were not because he simply wasn't interest in trying to accommodate me.
> So he didn't take the initiative to try to have a discussion with me about "Hey, maybe we can put you here," or put me there, and they have done that for other people.
> So I just felt that that was discriminatory.
>
>     *       *       *
>
> If their procedure or their protocol is not to have light-duty work in any capacity, why wasn't his response to Eleanor [Moffatt-Pender] when I came in, "Send her home right now"?
> Why didn't he do that right then?
> I contend, which I have been contending all along, there is light-duty work.
> I contend that by my own eyesight, that I saw with my own two eyes that other people have been able to come in and do light-duty work.
> I also contend that sometimes, based on the acrimonious relationship John Dinkins and I had, that he did not want me to have light-duty work, so light-duty work was not made available to me.

Of importance, besides her light duty assignment on December 17th and the allegedly comparable accounts of coworkers, described above, the Plaintiff asserts

no other basis for her belief that the Defendants misrepresented the availability of light duty work.

Dinkins disputes that he falsely represented the availability of light duty assignments. He testified that there were legitimate non-discriminatory reasons for requiring Tillman to return to work at full duty or not at all. In particular, Dinkins testified as follows:

> Q: [When you spoke on the phone with Moffatt-Pender on December 17, 2010] [w]hy did you say that [Tillman] has to return full duty?
> A: Because in order for her – at that particular juncture anyone that was returning to work had to be able to perform the function of the job. Marlayna [Tillman] stated that she couldn't perform the function of the job, so she was still out with restriction.
> Q: When you say she couldn't perform the functions, are you saying she couldn't do any of the functions?
> A: She couldn't do the job required function, which is pre-staging.
> Q: Right, but my question is, was she able at that point when she returned to work to do some of the function?
> A: Why would we need her to do some of the function? It's an end-to-end function.
>
> ＊　　＊　　＊
>
> A: . . . I'm trying to understand what you're saying, but if I bring you back to work, then my expectation is that you perform the entire function end to end. If you're going to your point, say just drive a forklift, that's not the job.

In addition, Dinkins testified about Verizon's ability to accommodate the Plaintiff's restrictions, as follows:

> Q: Did you ever consider giving her work that would allow her to do some of the functions of the job to accommodate her?
> A: No. My responsibility to the department is to have the person perform the job function. If there was some sort of accommodations that would have been made, it wouldn't be approved by me, so it wouldn't come from me. It would come from my manager.
> Q: Your manager meaning who?

A: Ruddy Reyes.

Q: Did you have any discussions with Ruddy Reyes about whether there were any accommodations that could have been given?

A: In my . . . operation there's nothing else to do but pre-staging.

Q: Right. But my question is, whether you actually talked to Ruddy Reyes about whether there were accommodations?

A: Yes, I did. There were no accommodations. Outside of pre-staging there were no accommodations. In pre-staging that's what the job function was.

In this regard, Dinkins testified that he did not have any discussions with Tillman about accommodations because Verizon "ha[s] no accommodations. The job is what it is. It requires lifting . . ." Reyes testified similarly: "[P]art of their job is to lift heavy weights, push, pull heavy weights, so I don't see where she would have a role with that. . . . [I]f you're not able to do that, then you can't perform that job of a Driver B."

However, Dinkins also testified that, ultimately, the decision to accommodate an employee is made by MetLife, not Verizon. In particular, he testified that injured employees seeking to return to work are required to communicate their request for an accommodation to MetLife, who considers the employee's medical information to determine whether or not an employee can perform the necessary functions of their job.

Reyes testified that, due to Tillman's failure to coordinate with MetLife regarding a potential return to work, she never properly requested a light duty accommodation. He testified that, although he had heard that Tillman informally presented a doctor's note restricting her lifting to objects under five pounds, he did not consider that an official request for an accommodation because it did not

comport with company procedure. This is consistent with Dinkin's testimony that MetLife marshals injured employee's medical information and ultimately arranges for their return to work, with or without restrictions. It is also consistent with the initial letter MetLife sent to Tillman confirming her approval for benefits, in which MetLife directed her to coordinate directly with them regarding her medical condition. It is further consistent with MetLife's claim activity log, in which case workers monitored Tillman's progress; scheduled her for medical examinations; and specifically indicated that they did not intend to communicate with Verizon regarding a possible accommodation unless and until the Plaintiff submitted to an IME.

According to Reyes, because Tillman failed to follow the established procedures for returning to work, she was never approved to do so, let alone to receive an accommodation.

Regarding the availability of light duty assignments in departments other than Tillman's, Reyes testified that he did not know of any Verizon employees being transferred to fulfill a properly-made light duty restriction request.

The Plaintiff points to no evidence that her department offered light duty assignments.

## H.    The Plaintiff's First NYSDHS Discrimination Charge

On February 28, 2011, the Plaintiff filed a charge of disability discrimination with the New York State Division of Human Rights. In that charge, Tillman described the alleged discrimination as follows:

I suffered an on the job injury to my arms at Verizon in December 2009. I went out on Workers Comp claim. In December 2010, I was cleared to return to work with restrictions by my treating physician, Dr. Robert Hecht. My restrictions were as follows: <u>No lifting anything over 5 lbs.</u> I returned to Verizon on 12/17/10. My supervisor, John Dinkins and Eleanor Pender-Moffitt [*sic*] approved me to work on that date, allowing me to work a full shift and accommodated my restrictions. I worked the entire shift and it was uneventful. However, on Mon 12/20/10, as I prepared to go into work, I received a voice message from my supervisor John Dinkins advising me that I was not to return to work until my physician approved me to work <u>without restrictions</u>. I was told that Verizon would not be accommodating my restrictions anymore. And until I received full clearance, there would be no light duty work or accommodations made for me. I was told that the company would be placing me back on workers comp again. I believe I am being discriminated against due to my current lifting restriction/disability, and further, am being misled by my supervisor with regard to their [*sic*] being <u>no</u> light duty work available for me at the facility. The company is simply refusing to accommodate my disability for discriminatory reasons. The fact that I was allowed to work a full shift on light duty on Fri 12/17/10, clearly demonstrates that the company not only has available light duty work, but that I was able to perform those duties and tasks without incident(s). . . .

<u>See</u> Ex. "R" to the Casher Decl. (emphasis in original).

There is no evidence that either Dinkins or Reyes knew of Tillman's first NYSDHS complaint at or about the time it was filed. In this regard, Dinkins testified that he was unaware the Plaintiff had even filed a complaint until asked about it during his deposition in this action. Reyes could not recall whether he learned about the complaint prior to Tillman being "job completed," or whether he ever read the complaint.

On or about February 6, 2013, the NYSDHS determined, after an investigation, that probable cause existed to believe that Verizon engaged in the complained-of discriminatory conduct.

Tillman withdrew that complaint in order to commence the instant lawsuit.

## I.     The Plaintiff's "Job Completed" Termination

It is undisputed that Reyes, in consultation with Verizon staffing professionals, determined that Tillman should be "job completed" at the expiration of her three-year term.  According to Reyes, the only consideration Verizon took into account in determining to "job complete" Tillman was that her temporary term was set to expire and they had no need to hire her on a full-time basis.

Accordingly, in a memorandum dated October 26, 2011, one day prior to Tillman's three-year anniversary with Verizon, a supervisor named Paul Vega, informed the Plaintiff that her services were on longer necessary and her temporary term of employment was completed.  Verizon also sent the Plaintiff a notice, dated October 30, 2011, regarding her right to continue the company's health coverage following the expiration of her term.

The Plaintiff testified that she did not receive these materials until November 1 or November 2, 2011.  Apparently, Tillman believes that, because she did not receive Vega's memo prior to her three-year anniversary, her temporary term lapsed and she "became" a full-time employee.

However, Reyes testified that the lapse of a temporary employee's term does not automatically operate to convert that employee to a full-time worker.  This is consistent with the Plaintiff's own testimony, described above, that she does not recall ever being told that temporary employees were automatically hired on a full-time basis.

In this regard, Reyes further testified that Verizon has no obligation to provide more than a day or two of advance notice that an employee is being "job completed." He stated that the only reason they send notice at all is to ensure that the employee does not continue to show up for work after their three-year anniversary.

Reyes testified that Tillman was not offered a full-time position because Verizon did not have a hiring need at that time. In fact, he testified that none of the other temporary employees hired at or about the same time as Tillman received full-time positions.

However, Reyes testified that approximately three to five temporary employees were re-hired after being "job completed" pursuant to a subsequent temporary employment requisition.

Apparently, the Plaintiff believes that she should have been among those re-hired temporary employees. However, Tillman fails to set forth any basis for this belief. In addition, Tillman fails to point to any evidence of a vacant position for which she was qualified.

Dinkins was transferred to Verizon's Hauppauge, New York location in October of 2010 and thus had not been working at the same location as the Plaintiff for approximately one year before she was "job completed."

**J.       The Plaintiff's Post-Termination Conduct**

Following the expiration of her temporary term of employment in late-October, 2011, the Plaintiff commenced a series of administrative proceedings, which the Court will briefly discuss.

**1.       The Plaintiff's Second NYSDHS Discrimination Charge**

On June 27, 2012, the Plaintiff filed a second charge of disability discrimination with the New York State Division of Human Rights.

Tillman's second NYSDHS complaint incorporated the first complaint, but further alleged as follows:

> On or about Nov 1st, 2011 – I was terminated w/o cause by my employer, Verizon Communications.  The actual date of termination has not been verified, I can only refer to the date stamp that was on the correspondence letter I received from the company which explained my right to "Cobra benefits."  The company never sent me an official termination letter explaining why I was terminated.  Instead, I had to contact my local union for verification of my dismissal.  I believe I was fired in retaliation to a previous discrimination complaint filed against my company alleging failure to accommodate a person with a disability; as I had sustained a work-related injury and attempted to return to work – my supervisor, John Dinkins, allowed me to return to work for one (1) day – then he (of his own volition) placed me back on sick leave and refused to accommodate my doctor ordered restrictions. The timing of my dismissal is also suspect, as I was slated to become a permanent, full-time employee with Verizon on 10/27/11.  The letter I received from the company hinting at my termination was dated-stamped **[*sic*]** on 11/1/11 and 11/2/11, and the information contained within was suspiciously back-dated to 10/30/11, but read that I had been terminated on 10/26/11, which is exactly one (1) day prior to when I would have been eligible to become a permanent employee with Verizon.  It also should be noted that I was still out on worker's comp (due to my supervisor John Dinkins actions) with an active, pending comp claim in process when I was dismissed without cause.  This action by my supervisors was clearly a retaliatory measure to ensure that I would not be able to return to my previous position under any

circumstances, and I would like to amend my original complaint to include a retaliation charge.

See Ex. "T" to the Casher Decl.

On or about December 24, 2012, the NYSDHS determined, after an investigation, that probable cause existed to believe that Verizon engaged in the additional discriminatory conduct alleged in the second complaint.

Tillman also withdrew the second complaint in order to commence the instant lawsuit.

### 2.     The Plaintiff's Workers' Compensation Complaint

On December 3, 2012, the Plaintiff filed a discrimination complaint with the New York State Workers' Compensation Board.  In that proceeding, Tillman claimed that from December 20, 2011, when Dinkins advised her not to come back to work until cleared for full-duty, until November 2, 2011, when she received notice that she had been "job completed," Verizon unlawfully prevented her from continuing to receive workers' compensation benefits.

The matter proceeded to an administrative hearing on July 31, 2013. Although Tillman provided the Court with an 89-page transcript of the proceedings, she claims in her counterstatement pursuant to Local Civil Rule 56.1 that the Workers' Compensation Board complaint "is not a part of this action."  Based on this representation, the Court need not address it.

However, in opposition to the instant motion, Tillman relies upon a statement by Chris Blom, a business agent for Tillman's union, made under oath at the Workers' Compensation hearing.  In relevant part, Blom stated that, based on

his experience working with the union, he believed that Verizon could accommodate employees with light duty assignments. However, Blom qualified his statement by stating that "[e]ach department is handled differently" and "[s]ome departments don't have the work."

This is consistent with the undisputed fact that Moffatt-Pender, who assigned Tillman to ostensibly light duty work on the night of December 17th oversees a department completely separate from that in which Tillman was hired. This is also consistent with Dinkins's testimony that no light duty work is available within his particular department, as well as Reyes's testimony that he was unaware of any Verizon employees having been transferred to a different department to fulfill a light duty restriction request.

### 3.    The Union Grievance

The Plaintiff's union filed a grievance against Verizon based on the events outlined above. The administrative record was not provided to the Court for review, but Tillman testified that the outcome of the grievance was that Verizon's determination to "job complete" her upon the expiration of her temporary employment term was "upheld"

## II.    Procedural History

On August 2, 2013, the Plaintiff commenced the instant action asserting two causes of action.

The First Cause of Action is against Verizon only and purports to allege a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"),

the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

The Court notes that, despite being labeled a single cause of action, the First Cause of Action contains numerous theories of relief. Due to the pleading's draftsmanship, Tillman's claims are not clear. However, as best as the Court can discern, the following bases for liability are asserted within the First Cause of Action:

(i)     Unlawful discrimination based on a disability in violation of the ADA, NYSHRL, and NYCHRL;

(ii)    Hostile work environment based on a disability in violation of the ADA, NYSHRL, and NYCHRL;

(iii)   Disparate treatment based on a disability in violation of the ADA, NYSHRL, and NYCHRL;

(iv)    Failure to reasonably accommodate a disability in violation of the ADA, NYSHRL, and NYCHRL;

(v)     Retaliation for exercising a protected activity in the form of requesting a reasonable accommodation for a disability in violation of the ADA, NYSHRL, and NYCHRL; and

(vi)    Retaliation for exercising a protected activity in the form of filing the first NYSDHS complaint in violation of the ADA, NYSHRL, and NYCHRL.

The Second Cause of Action is against Dinkins and Reyes, individually, and alleges aider and abettor liability under the NYSHRL and NYCHRL.

Issue was joined on November 15, 2013, and the parties completed discovery in January of 2015.

On February 13, 2015, the Defendants filed the instant motion seeking summary judgment dismissing the Complaint in its entirety. The Defendants' contentions are as follows:

(i) To the extent the Plaintiff seeks relief under the NYCHRL, such claims fail as a matter of law because the complained-of conduct did not occur within the boundaries of New York City;

(ii) The First Cause of Action, to the extent it asserts an unlawful discrimination claim under the ADA and NYSHRL, should be dismissed because the Plaintiff cannot establish a *prima facie* case;

(iii) The First Cause of Action, to the extent it asserts an unlawful retaliation claim under the ADA and NYSHRL, should be dismissed because the Plaintiff cannot establish a *prima facie* case;

(iv) The First Cause of Action, to the extent it asserts a failure to reasonably accommodate, should be dismissed because Verizon did, in fact, accommodate the Plaintiff;

(v) The First Cause of Action, to the extent it asserts a hostile work environment claim under the ADA and NYSHRL, should be dismissed because the Plaintiff cannot establish a *prima facie* case; and

(vi) The Second Cause of Action based in aiding and abetting should be dismissed because (a) the Plaintiff cannot establish a triable issue of fact as to the underlying discriminatory conduct alleged to have **been** aided and abetted, and (b) there is no record evidence that Dinkins and Reyes participated in discriminatory conduct.

## III.    Discussion

A.    **The Legal Standards**

1.    **Summary Judgment under Fed. R. Civ. P. 56**

Under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.' " <u>Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.</u>, 150 F.3d 132, 137 (2d Cir. 1998) (quoting <u>Garza v. Marine Transp. Lines, Inc.</u>, 861 F.2d 23, 26 (2dCir. 1998)).

"'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " <u>Redd v. N.Y. State Div. of Parole</u>, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"'[E]ven in the fact-intensive context of discrimination cases,' '[i]t is now beyond cavil that summary judgment may be appropriate.' " <u>EEOC v. Bloomberg, L.P.</u>, 967 F. Supp. 2d 816, 830 (S.D.N.Y. 2013) (quoting <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir 2001), <u>cert. denied</u>, 534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 105 (2000)). "Accordingly, a plaintiff alleging discrimination claims 'cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture.' " <u>Id.</u> at 831 (quoting <u>Jones v. Hirschfeld</u>, 348 F. Supp. 2d 50, 59 (S.D.N.Y. 2004)).

## 2.    The <u>McDonnell Douglas</u> Burden-Shifting Framework

Claims under the ADA and NYSHRL are analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). <u>See</u> <u>Brown v. Northrop Grumman Corp.</u>, 12-cv-

1488, 2014 U.S. Dist. LEXIS 116188, at *12-*13 (E.D.N.Y. Aug. 19, 2014). This test

has three steps:

> (1) the plaintiff must establish a *prima facie* case of discrimination; (2) if the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment action; and (3) the plaintiff then bears the ultimate burden of persuasion to prove that the defendants intentionally discriminated against him.

Adams v. Master Carvers of Jamestown, Ltd., 91 F. App'x 718, 720 (2d Cir. 2004).

> As the Supreme Court has advised:

> The ultimate question is whether the employer intentionally discriminated. . . . In other words, 'it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.' . . . Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Viruet v. Citizen Advice Bureau, 01-cv-4595, 2002 U.S. Dist. LEXIS 15045, at *40-

*42 (S.D.N.Y. Aug. 27, 2002) (quoting Reeves v. Sanderson Plumbing Prods., 530

U.S. 133, 146-49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)) (brackets in original).

### 3. The Standard for Claims under the NYCHRL

" '[C]ourts must analyze NYCHRL claims separately and independently from

any federal and state law claims,' and 'even if the challenged conduct is not

actionable under federal and state law, federal courts must consider separately

whether it is actionable under the broader New York City standards.' " Talwar v.

Staten Island Univ. Hosp., 14-cv-1520, 2015 U.S. App. LEXIS 7455, at *7-*8 (2d Cir.

May 6, 2015) (Summary Order) (quoting <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013)).

Discrimination claims brought under the NYCHRL are analyzed, like their federal and state counterparts, using the <u>McDonnell Douglas</u> burden-shifting framework. See Varughese v. Mount Sinai Med. Ctr., 12-cv-8812, 2015 U.S. Dist. LEXIS 43758, at *101-*102 (Mar. 7, 2015). However, courts are required to "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' " <u>Mihalik</u>, 715 F.3d at 109 (quoting <u>Albunio v. City of New York</u>, 16 N.Y.3d 472, 477-78, 922 N.Y.S.2d 244 (2011)).

## B. As to the Plaintiff's First Cause of Action Based on Unlawful Disability Discrimination Under the ADA

As noted above, the Court first considers the elements of Tillman's *prima facie* claim, before turning to the next step of the <u>McDonnell Douglas</u> burden-shifting scheme.

"In order to establish a *prima facie* case of disability discrimination under the ADA, the plaintiff must show that: (1) the defendants are subject to the ADA; (2) [s]he is disabled within the meaning of the ADA; (3) [s]he can perform the essential functions of [her] job with or without a reasonable accommodation; and (4) [s]he was subject to an adverse employment action because of [her] disability." <u>Adams</u>, 91 F. App'x at 720 (citing <u>Reeves</u>, 140 F.3d at 149-50).

As to the first element, the parties agree that Verizon is subject to the provisions of the ADA.

For purposes of this analysis, the Court assumes, without deciding, that questions of fact sufficient to survive summary judgment exist concerning whether: (1) Tillman's bilateral tennis elbow constituted a sufficiently severe restriction on her ability to perform the major life activities of lifting and working to count as a disability under the statute; and (2) Tillman could have performed the essential functions of her job with or without a reasonable accommodation.

However, construing the evidence with liberality in Tillman's favor, no rational juror could conclude that she suffered an adverse employment action based on her disability.

"In this circuit, an adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" Islamic Soc'y of Fire Dep't Pers. V. City of New York, 205 F. Supp. 2d 75, 83 (E.D.N.Y. 2002) (quoting Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001)). "Such a change 'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Weeks, 273 F.3d at 85).

Here, the alleged adverse employment action identified by Tillman is her "termination, which occurred when [her] temporary employment was ended and was not extended or made permanent." In the Court's view, such a contention fails as a matter of law.

The uncontroverted evidence establishes that Tillman was hired for a three-year term. Apparently, this is not unusual for Verizon, which utilizes temporary employees to meet short-term labor needs. The record makes clear that Tillman had no reasonable expectation that her employment would extend beyond three years. Her written job offer specifically identified her position as a temporary employee and incorporated the CBA, which defines a temporary employee as one employed for not more than three years. In addition, Tillman testified that, although she believed she would have an opportunity to become a full-time employee upon expiration of her temporary term, she was never told that such a conversion would happen automatically; that she did not know whether it would depend on Verizon's hiring needs at the time; and that she did not know whether she would have to specifically apply for full-time employment. Thus, the expiration of Tillman's predetermined temporary term cannot legitimately constitute an adverse employment action for purposes of the federal discrimination law. Indeed, discontinuing a temporary worker's employment at the expiration of a fixed three-year period cannot "materially [and] adverse[ly] change . . . the terms and conditions of [that] employment." In this Court's view, such a result is self-evident inasmuch as it conforms exactly to the terms of the employment offer that Tillman accepted.

Tillman's separate contention that she suffered an adverse employment action when Verizon failed to offer her full-time employment is similarly unavailing. Initially, it contradicts her own Complaint, which alleges that "[o]n October 27,

2011, [she] became a permanent employee of Verizon by virtue of the fact that her temporary work assignment had" lapsed. Compl. ¶ 24.

Nevertheless, the undisputed record evidence establishes that the expiration of a temporary employee's term does not operate to convert her to a full-time employee. Tillman herself testified that she had no reason to believe that she would automatically become a full-time employee at the expiration of her term. Rather, Tillman believed that full-time employment opportunities for temporary workers were merit-based and may require her to apply for a full-time position. She also did not know whether such an opportunity depended on Verizon's hiring needs. Reyes confirmed that full-time hiring opportunities did, in fact, depend on the company's hiring needs at the time, and testified that such decisions were discretionary, with Verizon reserving the exclusive right determine that the employee's services are no longer needed at the end of a three-year term.

It is clear that Verizon's offer of employment prominently notified Tillman that she was being hired as an at-will employee and could be terminated for any reason or no reason at all.

In this case, Tillman failed to materially dispute that her three-year temporary term ended; that Verizon had no need to hire her on a full-time basis; or that Verizon exercised its discretion to "job complete" her, consistent with the terms of her employment and the governing CBA. She also fails to present any evidence of a vacant position for which she was qualified, but was not selected.

Of note, Tillman does not dispute that Verizon also "job completed" the other temporary employees with whom she worked due to the fact that Verizon did not have enough work for them.

Relatedly, there is no evidence that Verizon's decision to "job complete" Tillman was causally connected to her disability or otherwise motivated by discriminatory animus. See Mines v. City of New York/DHS, 11-cv-7886, 2013 U.S. Dist. LEXIS 157782, at *25-*26 (S.D.N.Y. Nov. 4, 2013) ("Under the most lenient standard, for a disability discrimination claim under the ADA, a plaintiff must demonstrate that her disability was, in the very least, a 'motivating factor' for the adverse employment action, if not a 'but-for' cause for such an action" (quoting Parker v. Columbia Pictures, Indus., 204 F.3d 326, 336-37 (2d Cir. 2000)).

In this regard, the only evidence in the record is that Tillman's three-year term expired, and she was not offered a full-time position because Verizon did not have a full-time hiring need at that time. Tillman points to nothing in the record to materially dispute this important fact.

Accordingly, the Plaintiff cannot establish a *prima facie* claim based on discrimination in violation of the ADA, and the Court need not progress further under the McDonnell Douglas burden-shifting scheme. The Defendants' motion for summary judgment, to the extent it seeks to dismiss the First Cause of Action on the basis of unlawful disability discrimination under the ADA, is granted.

## C. As to the Plaintiff's First Cause of Action Based on a Hostile Work Environment Under the ADA

The Defendants contend that summary judgment is warranted as to the First Cause of Action, to the extent it seeks dismissal of the Plaintiff's claim based on a hostile work environment in violation of the ADA. The Plaintiff fails to address this point in opposition to the instant motion.

Therefore, the Court deems that aspect of the First Cause of Action abandoned, and the Defendants' motion for summary judgment, to the extent it seeks to dismiss the Plaintiff's claim based on a hostile work environment under the ADA, is granted. See Avola v. Louisiana-Pacific Corp., 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) (granting summary judgment on five claims not directly opposed in the plaintiff's opposition papers) (citing Struthers v. City of N.Y., 12-cv-242, 2013 U.S. Dist. LEXIS 76916, at *62-*63 (E.D.N.Y. May 31, 2013); Robinson v. Roosevelt Union Free Sch. Dist., 10-cv-834, 2012 U.S. Dist. LEXIS 76524, at *18 (E.D.N.Y. May 31, 2012); Santiago v. City of N.Y., 05-CV-3668, 2009 U.S. Dist. LEXIS 30371, at *37-*38 n.20 (E.D.N.Y. Mar. 31, 2009); Williams v. British Airways, PLC, 04-cv-471, 06-cv-5085, 2007 U.S. Dist. LEXIS 73997, at *47-*48 (E.D.N.Y. Sept. 27, 2007); Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006); DeVito v. Barrant, 03-cv-1927, 2005 U.S. Dist. LEXIS 22444, at *33 (E.D.N.Y. Aug. 23, 2005); Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way").

**D.    As to the Plaintiff's First Cause of Action Based on Disparate Treatment under the ADA**

As noted above, Tillman's First Cause of Action appears to incorporate a claim for disparate treatment based on a disability in violation of the ADA.  In this regard, Tillman asserts that she was treated differently than other similarly-situated employees because Dinkins occasionally assigned her a heavier workload and, while other similarly-situated temporary employees were re-hired after being "job completed," she was not.

The Defendants do not directly address this point in their moving brief.  However, the Plaintiff vaguely contends in its opposition brief that, with respect to disparate treatment:

> [S]ome of the other temporary Driver B employees who were hired at the same time as Plaintiff but who were 'job completed' before Plaintiff were rehired by Defendants.  Tillman, in contrast, was not offered to be rehired by Defendants.

Even though the Complaint failed to clearly delineate a claim based upon disparate treatment, Tillman raised the issue on summary judgment, and the Court, in its discretion, will address it here.    See  Fed. R. Civ. P. 56(f)(1)-(2) (authorizing the Court to grant summary judgment for a nonmovant or on grounds not raised by a party, if the parties have notice and a reasonable chance to respond).

"One form of circumstantial evidence probative of discrimination is evidence 'showing that the employer subjected [the Plaintiff] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group.' "  Holleman v. Art Crating Inc., 12-cv-2719, 2014 U.S. Dist. LEXIS

139916, at *96 (E.D.N.Y. Sept. 30, 2014) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). The disparate treatment theory is a method of establishing a *prima facie* case of discrimination and the burden of establishing a persuasive comparison lies with the Plaintiff. See McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).

In this case, again assuming that Tillman's bilateral tennis elbow is a disability under the ADA, she has presented no evidence that Dinkins assigned her more work than her coworkers *because* she is disabled as she now asserts. On the contrary, Tillman testified that she does not know what motivated Dinkins to assign her a heavier workload and conclusorily attributed his behavior to their "acrimonious relationship" and the fact that they did not "see eye to eye on a lot of things." Such allegations do not present a discriminatory motive.

Similarly, the Plaintiff states that she "was never re-called" for a job after being "job completed" and "was never given the same opportunity as the other workers, to come back, or to have the opportunity to come back to be rehired . . ."

The Plaintiff points to no evidence of a vacant position for which she was qualified to be re-called. She presents no evidence of the alleged procedure for "re-calling" laid off employees that allegedly should have resulted in her re-hire. She points to no evidence of the "other workers" that she references, or the "opportunity" given to them, but denied to her. Thus, there is nothing to elevate Tillman's assertions in this regard other than mere speculation.

However, even the scant evidentiary proof belies Tillman's claims. Reyes testified that the order in which laid off employees are re-called is based on seniority, and that Tillman is "the least senior . . . So anyone else with more time and title could take the position. Even if she bid[ ] on it, she wouldn't have gotten it." Tillman does not dispute this factual assertion by Reyes.

Of particular importance, Reyes's testimony indicates that, in order for a laid off employee to be considered for re-hire, they must "bid" for the position. Tillman fails to materially dispute this assertion. This is consistent with the Plaintiff's testimony that full-time employment opportunities were merit-based and that she was unsure whether an application process was involved. However, the Plaintiff does not claim that she ever applied, bid for, or otherwise sought a position with Verizon after being "job completed." Apparently, Tillman's contention is that Verizon should have actively sought her out for employment opportunities after her temporary term expired. However, such a position is unsupported by any evidence in the record and is an untenable conclusion.

Accordingly, even construing the evidence in the light most favorable to Tillman, the Court finds that her allegations of disparate treatment are insufficient to raise a triable issue of fact where none otherwise exists. Accordingly, the Court dismisses the First Cause of Action to the extent it asserts disparate treatment in violation of the ADA.

### E.    As to the Plaintiff's First Cause of Action Based on Failure to Reasonably Accommodate under the ADA

The Plaintiff asserts a claim for failure to reasonably accommodate her, which is based on two distinct premises:  (i) Verizon failed to accommodate her with light duty assignments; and (ii) Verizon also failed to engage her in an interactive process in order to assess her needs and determine the appropriateness of a reasonable accommodation.   The Defendants contend that summary judgment is appropriate with respect to both aspects of this claim.   Therefore, the Court begins its analysis by reviewing the governing law as to both contentions.

### 1.    The Applicable Law on Reasonable Accommodations

An employer may be liable under the ADA if it " 'fails to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability.' "   Morris v. Town of Islip, 12-cv-2984, 2014 U.S. Dist. LEXIS 133168, at *35 (E.D.N.Y. Sept. 22, 2014) (quoting Cody v. County of Nassau, 577 F. Supp. 2d 623 (E.D.N.Y. 2008), aff'd, 345 F. App'x 717 (2d Cir. 2009)); see 42 U.S.C. § 12112(b)(5)(A).

In this regard, Tillman's *prima facie* burden requires her to establish " 'that (1) [she] is a person with a disability under the meaning of the ADA ; (2) an employer covered by the statute had notice of [her] disability; (3) with [or without] reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.' "   Scalera v. Electrograph Sys., 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (quoting Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006)).

The burden-shifting framework set forth in McDonnell Douglas, outlined above, applies to claims based on failure to accommodate. See id. Accordingly, after the Plaintiff makes a *prima facie* showing of a failure to accommodate, the burden shifts to the Defendants to demonstrate that the Tillman's proposed accommodation would result in an undue hardship. See Diaz v. Local 338, 13-cv-7187, 2015 U.S. Dist. LEXIS 86777, at *72 (E.D.N.Y. May 15, 2015) (Report and Recommendation), adopted, 2015 U.S. Dist. LEXIS 86648 (E.D.N.Y. July 2, 2015) (quoting Morris, 2014 U.S. Dist. LEXIS 133168, at *35); see also Scalera v. Electrograph Sys., 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (holding, in an ADA case, that "once Plaintiff puts forth a *prima facie* case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship") (citing Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997); E.E.O.C. v. Yellow Freight Sys. Inc., 98-cv-2270, 2002 U.S. Dist. LEXI S16826, at *58 (S.D.N.Y. Sept. 9, 2002); cf. United States v. N.Y. City Tr. Auth., 04-cv-4237, 2010 U.S. Dist. LEXIS 102704, at *46 (E.D.N.Y. Sept. 28, 2010) (holding, in an analogous context that "[o]nce a *prima facie* case [based on failure to reasonably accommodate] is established, the burden shifts to the employer to show that it could not reasonably accommodate plaintiff without undue hardship") (citing Philbook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985), aff'd & remanded on other grounds, 479 U.S. 60, 107 S. Ct. 367, 93 L. Ed. 2d 305 (1986)); .

A claim based on a failure to make reasonable accommodations does not require the Plaintiff to show a discriminatory animus. See Scalera, 848 F. Supp. 2d

at 362. Rather, it is sufficient to establish that a covered entity failed to fulfill its affirmative duty to make a reasonable accommodation for the known physical or mental limitations of a disabled employee. See id.

" 'On the issue of a reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits.' " Feeley v. New York City Police Dep't, 97-cv-2891, 2001 U.S. Dist. LEXIS 25431, at *32-*33 (E.D.N.Y. Sept. 4, 2001) (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 139 (2d Cir. 1995)); see Jackan v. New York State Dep't of Labor, 205 F.3d 562, 567 (2d Cir. 2000) (noting that the plaintiff's burden is not a heavy one and "[i]t is enough . . . to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits" (quoting Borkowski, 63 F.3d at 138)), cert denied, 531 U.S. 931, 121 S. Ct. 314, 148 L. Ed. 2d 251 (2000).

Relevant here, while the statute contemplates that "[a] reasonable accommodation may include reassignment to a vacant position," Thompson v. N.Y. City Dep't of Prob., 348 F. App'x 643, 645 (2d Cir. 2009) (citing 42 U.S.C. § 12111(9)), the employer need not find or create a position for the employee," id. (citing Daugherty v. City of El Paso, 56 F.3d 695, 700 (5th Cir. 1995), cert. denied, 516 U.S. 1172, 116 S. Ct. 1263, 134 L. Ed. 2d 211 (1996)). In fact, "[a]n ADA plaintiff seeking accommodation in the form of a transfer bears the burden of proving that a vacancy existed into which he or she might have been transferred."

Id. (citing <u>Jackan v. New York State Dep't of Labor</u>, 205 F.3d 562, 566 (2d Cir. 2000), <u>cert denied</u>, 531 U.S. 931, 121 S. Ct. 314, 148 L. Ed. 2d 251 (2000)).

The Second Circuit has condensed the relevant legal principles into a two-step test: " 'First, the plaintiff bears the burden of proving . . . that an accommodation exists that permits her to perform the job's essential functions.' [<u>Borkowski</u>, 63 F.3d] at 138. If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation[ ] is reasonable; on this question the burden of persuasion lies with the defendant. <u>See id</u>." <u>Jackan</u>, 205 F.3d at 566.

### 2. The Applicable Law on an Interactive Process

It is well-settled that "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." <u>Id.</u> (citing <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1135 (7th Cir. 1996); 29 C.F.R. § 1630.2(o)(3)).

"To satisfy its ADA obligations in this regard, an 'employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of those alternative positions, with or without reasonable accommodation.' " <u>Felix v. N.Y. City Tr. Auth.</u>, 154 F. Supp. 2d 640 (S.D.N.Y. 2001), (quoting <u>Dalton v. Subaru-Isuzu Auto., Inc.</u>, 141 F.3d 667 (7th Cir. 1998)), <u>aff'd</u>, 324 F.3d 102 (2d Cir. 2003).

However, it is critical to note that the failure to engage in an interactive process does not, itself, "form the basis of an ADA claim in the absence of evidence that accommodation was possible." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 100 (2d Cir. 2009). As a result, evidence of an employer's failure to engage in an interactive process "does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." Id.

### 3. The Analysis

Tillman's allegations that Verizon failed to engage her in an interactive process are without merit. The record makes clear that Verizon utilizes MetLife for the specific purpose of maintaining an ongoing dialogue to monitor injured employees' medical progress; to work with them to determine what restrictions and accommodations are needed in order for them to return to work; and to coordinate with the employer on the injured employees' behalf. The record is clear that MetLife confirmed its approval of Tillman's medical leave and associated benefits in December of 2009 and specifically advised her to keep them apprised of any developments concerning her condition or potential return to work. In fact, MetLife instructed Tillman to arrange for her physician to fax specific medical information to MetLife for its consideration and that, in the event Tillman's doctor cleared her for work, with or without restrictions, prior to December 12, 2010, she "must contact MetLife and [her] Supervisor/Absence Administrator immediately."

Both Dinkins and Reyes testified that MetLife is the liaison between injured employees and Verizon and such employees are not permitted to return to work without MetLife's clearance. Further, the evidence establishes that Verizon relies upon MetLife to process such employees' medical information; monitor their progress; and ultimately facilitate, to the extent possible, a successful transition back to work, with or without restrictions. The level of MetLife's involvement is undeniable based on Tillman's claim activity log.

However, it is undisputed that Tillman did not comply with these procedures. It is undisputed that she received clearance from her physician on December 1, 2010 to return to work with a lifting restriction, but did not notify MetLife or Verizon. She then appeared an hour early for a December 9, 2010 medical examination scheduled by MetLife, and refused to stay for the actual appointment. When MetLife advised her that they would not take further action to coordinate her return to work unless she submitted to the previously-scheduled medical examination, she denied having refused to stay and attempted to claim that the physician was late, not her.

Moreover, it is undisputed that Tillman made no effort to negotiate with MetLife in advance of unilaterally returning to work on December 17, 2010. She contends, with no evidentiary support, that she believed her doctor's office had provided Verizon with a note clearing her for light duty. However, even if that were true, the established practices and procedures were not satisfied by the presentation of a doctor's note, without MetLife's approval. Indeed, as Reyes and

Dinkins made clear, Verizon takes its marching orders in this regard from MetLife. Thus, there can be no legitimate question that Tillman did not seek formal approval to return to work and never formally requested an accommodation.

Of particular importance, the need for Tillman to follow the established procedures was communicated to her time and again, but she chose to disregard them. As noted above, MetLife instructed Tillman of her obligations in its initial written confirmation of benefits. Also, MetLife's claim activity log reflects repeated efforts by MetLife to encourage Tillman's compliance with their procedures. Further, according to Tillman, Dinkins contacted her after she arrived for work on December 17, 2010 and notified her that she could not return to work until she had been cleared for full duty. Tillman admits she never called Dinkins back and did not contact MetLife in response to his message. It is undisputed that, over the course of the next year, even armed with knowledge of what was required for her to return to work, she took no efforts whatsoever to satisfy those requirements, opting instead to file a series of grievances and discrimination complaints. Tillman cannot now be heard to contend that Verizon failed to engage her in an interactive process.

Tillman's contention that Verizon failed to reasonably accommodate her is similarly unavailing. On that issue, Tillman bears the burden of identifying an accommodation. To that end, she asserts that she should have either (a) been given light duty assignments or (b) had "her job . . . broken down or altered to accommodate her medical need for light duty."

Initially, the Plaintiff's contention in this regard presupposes that she properly sought an accommodation. As set forth above, the Court finds that she neither received clearance to return to work or requested an accommodation in accordance with Verizon's established procedures. She is therefore barred from claiming that such an accommodation was denied.

Nevertheless, assuming that her requests were proper, Tillman is unable to sufficiently raise an issue of fact as to Verizon's failure to reasonably accommodate her.

As to the first of her proposed accommodations, Tillman has failed to present any evidence suggesting that light duty work was available to her. In this regard, both Dinkins and Reyes testified that the temporary position for which Tillman was hired involved only one function, which could not be modified to remove the lifting aspect. The Plaintiff does not dispute this. Instead, she points to the assignment that Moffatt-Pender gave her on December 17, 2010 as proof that light duty assignments were available. However, the record is abundantly clear that Moffatt-Pender was not Tillman's supervisor and did not oversee the same department in which Tillman worked. Thus, apparently, Tillman's contention is that she should have been transferred to another department in an effort to provide her with a light duty assignment.

However, as noted above, "[a]n ADA plaintiff seeking accommodation in the form of a transfer bears the burden of proving that a vacancy existed into which he or she might have been transferred." Tillman has presented no such evidence. On

the contrary, Dinkins testified, and Tillman did not dispute, that the work given to her by Moffatt-Pender belonged to a full-time employee and should not have been handled by the Plaintiff.

The Court notes that the only evidence relied upon by the Plaintiff is Chris Blom's statement at her Worker's Compensation hearing that *some* departments at Verizon offer light duty work, and some do not. Reyes testified that the Plaintiff's department was not a department in which light duty was available. Tillman did not materially dispute this contention. Reyes stated unequivocally that "part of [Tillman's] job is to lift heavy weights, push, pull heavy weights . . . [I]f you're not able to do that, then you can't perform that job of a Driver B." Dinkins testified similarly, stating that "[t]here were no accommodations. Outside of pre-staging there were no accommodations. In pre-staging that's what the job function was."

Reyes also testified that he did not know of any Verizon employees having been transferred between departments to fulfill a light duty request. Again, Tillman failed to materially dispute this assertion and presented no evidence to the contrary. Although she identified Ansell Thompson, Ed Egen, and an employee named Bruce as possible comparators in this regard, as to each of these individuals Tillman was unable to provide even the vaguest details concerning the nature of their injuries; the physical restrictions, if any, imposed upon them; or whether they were accommodated at all, let alone by being provided a departmental transfer. In the absence of any supporting evidence, these vague references are insufficient to raise an issue of fact.

Similarly, Tillman's suggestion that Verizon should have considered "[breaking] down or alter[ing her job] to accommodate her medical need for light duty" is insufficient to defeat summary judgment. She presented no evidence that she ever requested an accommodation of this nature; what such an accommodation would entail; or that such an accommodation was reasonably possible. On the contrary, Dinkins testified that Tillman's responsibility as a "Driver B" in the pre-staging environment was an "end-to-end" function that could not feasibly be segregated into individual light duty assignments, such as only driving a forklift. Again, Tillman did not materially dispute this contention.

For the reasons stated above, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the First Cause of Action on the basis of failure to reasonably accommodate her under the ADA, is granted.

## F.    As to the Plaintiff's First Cause of Action Based on Retaliation under the ADA

As stated above, the Court notes at the outset that the Complaint may be construed as alleging retaliation for exercising a protected activity in the form of filing the first NYSDHS complaint. The Defendants contend that summary judgment is warranted as to that claim. However, Tillman fails to address this contention in opposition to the instant motion. Accordingly, to the extent the First Cause of Action may be construed as a retaliation claim based upon the protected activity of filing a NYSDHS complaint, that claim is deemed abandoned. See Avola, 991 F. Supp. 2d at 390 ; Struthers, 2013 U.S. Dist. LEXIS 76916, at *62-*63; Robinson, 2012 U.S. Dist. LEXIS 76524, at *18; Santiago, 2009 U.S. Dist. LEXIS

30371, at \*37-\*38 n.20; <u>Williams</u>, 2007 U.S. Dist. LEXIS 73997, at \*47-\*48;

<u>Ostroski</u>, 443 F. Supp. 2d at 340; <u>DeVito</u>, 2005 U.S. Dist. LEXIS 22444, at \*33;

<u>Taylor</u>, 269 F. Supp. 2d at 75.

As set forth in her opposition to the instant motion, the basis for Tillman's retaliation claim is as follows:  in retaliation for the Plaintiff's request of a light duty assignment, Verizon "forced her out of work," which amounted to a *de facto* suspension.

"To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show the following elements:  '(1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity.' " <u>Krachenfels v. N. Shore Long Island Jewish Health Sys.</u>, 13-cv-243, 2014 U.S. Dist. LEXIS 103474, at \*61 (E.D.N.Y. July 29, 2014) (quoting <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002)).  If the Plaintiff establishes a *prima facie* claim under this standard, the <u>McDonnell Douglas</u> burden-shifting scheme is activated.  <u>See</u> <u>id.</u> at \*60-\*61.

In this case, summary judgment is appropriate because Tillman cannot establish the third and fourth elements, as a matter of law.

As to an adverse employment action, Tillman's assertion that she endured a *de facto* suspension is contrary to the facts.  As discussed above, the record is clear that Tillman did not follow the established procedures for obtaining clearance to return to work or to receive an accommodation.  She failed to cooperate with

MetLife's interactive process and to submit to the medical examination that, as the claim activity log indicated, "would likely have provided an accurate description of her functional status" and provide "clinical evidence that [Tillman] [wa]s unable to perform her usual job duties beyond 12/12/10." Rather, after receiving clearance from a third-party physician, which she failed to provide to MetLife or Verizon, she unilaterally decided to report for work after a year-long absence, and present her doctor's note to a supervisor from a different department.

Thereafter, neither Dinkins nor anyone else at Verizon took actions that can plausibly be characterized as "forcing Tillman out of work." Rather, she was advised, consistent with established protocol and the explicit directions she had received from MetLife, that she needed to be properly medically cleared before returning to work. This is not a suspension as a matter of law.

In reaching this conclusion, the Court finds it disingenuous for Tillman to contend that she was "suspended" between December 2010 and October 2011, while pointing to no evidence in the record that she made any attempt whatsoever to return to work. Rather, it is undisputed that, after being advised that she could not work until properly cleared by MetLife, the Plaintiff did not even return Dinkins's phone call. Instead, she embarked on a campaign of filing administrative complaints that accused Dinkins, Reyes, and Verizon of unlawfully discriminating against her. In the Court's view, this factual scenario is insufficient to buttress a retaliation claim.

There also is no evidence in the record to suggest that Verizon's decision to require Tillman to obtain full-duty clearance was causally connected to her alleged request for an accommodation. Rather, the only credible evidence demonstrates that the sole reason for Verizon's refusal to allow Tillman to continue to come to work after December 17, 2010 was her failure to coordinate with MetLife during her medical leave. In this regard, the Plaintiff admits that she failed to obtain MetLife's approval before returning to work. In the Court's view, this fact supports the finding that Verizon's actions were not motivated by discriminatory animus.

As a result, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the First Cause of Action on the basis of retaliation under the ADA, is granted.

## G.    As to the Plaintiff's Claims Under the NYSHRL and NYCHRL

In her Complaint, Tillman expressly invokes this Court's federal question jurisdiction over her claims under the ADA, and its supplemental jurisdiction over her related state law claims. In this regard, the Court notes that Tillman does not invoke the Court's diversity jurisdiction.

Having determined that the Plaintiff's federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any of the remaining state law claims is unwarranted.

" 'In the interest of comity, the Second Circuit instructs that absent extraordinary circumstances, where federal claims can be disposed of pursuant to [Fed. R. Civ. P. 56], courts should abstain from exercising pendent jurisdiction.' "

O'Leary v. Town of Huntington, 11-cv-3754, 2012 U.S. Dist. LEXIS 126086, at *48-*49 (E.D.N.Y. Sept. 5, 2015) (quoting Birch v. Pioneer Credit Recovery, Inc., 06-cv-6497, 2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007)) (internal quotation marks omitted).   Accordingly, having dismissed all of the Plaintiff's claims over which it has original jurisdiction the Court, in its discretion, declines to exercise supplemental jurisdiction over Tillman's claims based on violations of the NYSHRL and NYCHRL.   See id. at *49 (collecting cases).

For similar reasons, the Court need not review the Defendants' contention that the Labor Management Relations Act, 29 US.C. § 185 *et seq.*, precludes the Plaintiff's claims.

## IV.    Conclusion

For the reasons set forth in this decision, the Court grants the Defendants' motion for summary judgment dismissing the Plaintiff's First and Second Causes of Action to the extent they assert violations of the ADA.

Having found summary judgment appropriate as to those claims over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the First and Second Causes of Action to the extent they assert violations of New York State and New York City statutes.

The Clerk of the Court is directed to close this case.

**SO ORDERED**

Dated: Central Islip, New York          */s/ Arthur D. Spatt*_____
July 30, 2015                              ARTHUR D. SPATT
                                              United States District Judge

53